J-A02015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: G.F. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 889 WDA 2022 |

Appeal from the Decree Entered August 4, 2022
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s):  17 Adopt 2022

BEFORE:  BOWES, J., OLSON, J., and MURRAY, J.

MEMORANDUM BY OLSON, J.:                    **FILED: FEBRUARY 27, 2023**

Appellant, P.P. ("Mother"), appeals from the orphans' court decree dated July 21, 2022, and entered August 4, 2022, in the Court of Common Pleas of Fayette County, involuntarily terminating her parental rights to her daughter, G.F. ("Child"), born in October 2020.[1]  After careful review, we affirm.

The Fayette County Children and Youth Services ("CYS" or "the Agency") became involved with this family on November 16, 2020, after receiving a report alleging that Child, who was discharged from the hospital on November 4, 2020, lost two pounds in ten days, and after Child stopped breathing, the

---

[1]  The orphans' court terminated the parental rights of putative father, D.M. ("Father"), and any unknown father.  *See* Orphans' Court Opinion, 10/11/22, at 1.  Neither Father nor any unknown father has filed a separate appeal, and they are not participants in the instant appeal.

family had to perform CPR on her but failed to seek medical attention.[2] N.T., 6/2/22, at 15-16. Upon investigation, CYS validated the allegations of inadequate health care, inadequate basic needs, and inadequate housing because Child had not been seen by a pediatrician since she was discharged from the hospital, Mother failed to seek medical treatment for Child for the initially reported incident, and Mother did not have necessities for Child, including diapers, wipes, bottles, and formula. *Id.* at 16-17. Additionally, on November 19, 2020, Mother, who had been residing with a cousin, was evicted from the home and unwilling to stay in a shelter apart from her paramour. *Id.* at 8, 16-17.

Pursuant to an emergency order, on November 19, 2020, CYS obtained custody of Child and placed Child with foster parents, E.S. and R.S. *Id.* at 5-6. The court adjudicated Child dependent on December 3, 2020. *Id.* at 6. CYS established the following family service plan objectives for Mother in furtherance of reunification, including: (1) obtaining a mental health evaluation and following recommendations; (2) attending all mental health appointments; (3) attending all scheduled visits with Child; (4) attending parenting classes; (5) obtaining and maintaining appropriate housing;

---

[2] According to CYS caseworker, Jessica Roberts, "[t]he allegations were later unfounded by the medical records that show that [Child] had . . . cardiopulmonary abnormalities and [Child]'s weight had been initially logged incorrectly." N.T., 6/2/22, at 16. However, CYS ultimately validated allegations of inadequate health care, inadequate basic needs, and inadequate housing. *Id.*

(6) signing releases; (7) meeting with the caseworker and notifying her of any address change; and (8) providing for Child's basic needs. *Id.* at 7-8.

Mother was offered in-person visits twice a week, supervised by Justice Works Youth Care. *Id.* at 20-21, 23, 33-34. Between November 2020 and March 2021, Mother resided in various motels and hotels in West Virginia. *Id.* at 9. During that time span, Mother attended a total of six in-person visits with Child. *Id.* at 20-21.

In March 2021, Mother obtained housing in Westmoreland County, Pennsylvania. *Id.* at 9. However, before CYS could assess the home, Mother was arrested on March 31, 2021, due to a "domestic situation" and was held at the Westmoreland County Jail. *Id.* at 9-10. On an unspecified date after her arrest, Mother was extradited to Virginia because of an outstanding warrant, and she remained incarcerated until she was released on bail on May 28, 2021. *Id.* at 10-11. Upon her release, Mother was prohibited from leaving Virginia for another "couple [of] months" until her case came to a close. *Id.* at 11, 52.

During Mother's period of incarceration, visits did not occur as CYS was unsuccessful in contacting Mother when she was in Westmoreland County Jail, and they did not know her whereabouts after she was extradited to Virginia. *Id.* at 22. Visits resumed on June 14, 2021, at which time Mother was offered supervised virtual visits, twice a week. *Id.* At the time of the subject

proceeding, Mother was residing in a hotel in Virginia with a paramour. *Id.* at 45, 57, 60, 64.

On March 11, 2022, CYS filed a petition to involuntarily terminate Mother's parental rights, alleging grounds for termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). The orphans' court held a hearing on the petition on June 2, 2022, at which time Child was one year and seven months old. Child was represented by Kim Kovach, Esquire.[3] CYS presented testimony of its caseworker, Jessica Roberts, and Justice Works Youth Care family resource specialist, Brittany Johnston. Mother testified on her own behalf.

CYS caseworker, Ms. Roberts, testified that Mother was previously involved with the Family Services Agency in Virginia in relation to another child. *Id.* at 17. Ms. Roberts testified CYS contacted Virginia's Family Services Agency to inquire about its involvement with the family, and CYS received records which revealed that Mother "had some significant mental health issues." *Id.* at 15, 17. Ms. Roberts stated that Mother denied having any mental health or anger management issues. *Id.* at 18.

_____

[3] Insomuch as Child's legal interests were incapable of ascertainment due to her young age, the court did not appoint separate counsel for Child. *See In re T.S.*, 192 A.3d 1080, 1092-1093 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

Ms. Roberts testified that Child has an umbilical hernia, but it did not require any additional appointments outside of her routine appointments. *Id.* at 19-20. Ms. Roberts testified that Child does not have any developmental or emotional issues at this time. *Id.* at 25-26. She further testified that Child is "doing fine" physically and that Child's "bile issue has been improving[,] and she has no issues from her umbilical hernia at this time." *Id.* at 26.

At the conclusion of the hearing, the orphans' court involuntarily terminated Mother's parental rights to the Child by decree dated July 21, 2022, and entered August 4, 2022. On August 5, 2022, Mother timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On October 11, 2022, the orphans' court filed a Rule 1925(a) opinion.

Mother sets forth the following issue for our consideration:

1.    Did the [orphans'] court abuse its discretion in terminating the parental rights of the natural [M]other, P.P., as Fayette County [CYS] failed to present sufficient evidence to sustain its burden of proof?

Mother's Brief at 3 (unnecessary capitalization omitted).

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*,

256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear

- 6 -

conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." **Id.**; **see** 23 Pa.C.S.A. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under Section 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." **Interest of L.W.**, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

Here, we review the orphans' court's decree pursuant to Section 2511(a)(2) and (b), which provide as follows:[4]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .

---

[4] We need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights. **In re Adoption of K.M.G.**, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted). In this case, we analyze the court's decree pursuant to Section 2511(a)(2).

- 7 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental

- 8 -

duties." ***In re S.C.***, 247 A.3d 1097, 1104 (Pa. Super. 2021), *quoting **In re Adoption of C.D.R.***, 111 A.3d 1212, 1216 (Pa. Super. 2015) (internal citation omitted). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." ***Matter of Adoption of M.A.B.***, 166 A.3d 434, 443 (Pa. Super. 2017), *quoting **In re N.A.M.***, 33 A.3d 95, 100 (Pa. Super. 2011). As such, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re S.C.***, 247 A.3d at 1105, *quoting **In re Z.P.***, 994 A.2d 1108, 1118 (Pa. Super. 2010).

In ***S.P.***, our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The ***S.P.*** Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." ***S.P.***, 47 A.3d at 828. Further, the Court explained,

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2).

*Id.* at 830.

On appeal, Mother asserts that CYS failed to present clear and convincing evidence to establish grounds for termination under Section 2511(a)(2). Mother's Brief at 16. She claims that despite the obstacles imposed by her incarcerations in Pennsylvania and Virginia, she "exercised reasonable firmness by continuing to make progress on her goal plan and by managing to stay in contact with the [C]hild." *Id.*

> Instantly, the orphans' court found:

> Mother has shown a repeated and continued incapacity [and] neglect starting at the very beginning of [Child]'s life in failing to attend to a very serious condition wherein the [C]hild had to have CPR. She failed to seek immediate medical attention.

> Mother has been transient and/or homeless throughout the course of the case. She has lived for a few months here and there with friends, public housing, incarceration, and various hotel/motel rooms. There is a pattern of instability in living arrangements and in changing paramours. . . .

> Mother has no verifiable history of evaluation or treatment of any mental health disorder as she has not complied with the Agency's request for an evaluation and treatment nor has she provided proof of any such treatment to the [c]ourt. In addition, Mother has not provided signed releases for treatment to be verified by using the flimsy excuse that she has no access to the mail. Throughout the hearing, Mother would use profanity directed to the caseworker testifying and interrupted the proceedings. At the conclusion of testimony, Mother left the courtroom. Mother has been non-compliant in communicating regularly with the Agency and with her [C]hild. She has missed the majority of scheduled visits.

Orphans' Court Opinion, 10/11/22, at 9-10.

The record provides ample evidence in support of the orphans' court's decision to terminate Mother's parental rights. Mother's permanency goal objectives to reunify with Child included, *inter alia*: completing a mental health evaluation; attending all mental health appointments; attending all scheduled visits with Child; attending parenting classes; obtaining and maintaining appropriate housing; and signing releases. N.T., 6/2/22, at 7-8, 19.

With respect to Mother's mental health and parenting objectives, CYS caseworker, Ms. Roberts, testified that while Mother denied having any mental health issues, Mother informed Ms. Roberts that she was on "mental health medication" but did not provide any further information. *Id.* at 14, 18. Ms. Roberts testified that she e-mailed Mother a letter and a dependency court order, requesting verification of Mother's medication. *Id.* at 14. However, Mother did not provide any verification. *Id.* at 14, 18. Ms. Roberts testified that Mother did not complete a mental health evaluation, did not sign any releases for CYS, has not enrolled in parenting classes in Pennsylvania or Virginia, and has not provided any documentation showing she completed a parenting class. *Id.* at 11-12, 14.

Significantly, on cross-examination, Mother testified she believed she had depression in 2014 or 2015 and, at the time, she had taken Depakote, Seroquel, Abilify, Zoloft, and Prozac. *Id.* at 62. Mother also testified that she was voluntarily hospitalized for mental health reasons twice, in 2014 and 2015. *Id.* at 63. Mother explained that she presently attends therapy to cope

with the loss of her family members, but she is not taking any medications. *Id.* at 63-64. Mother testified that she began therapy three months before the subject proceeding and attends sessions every two or three weeks. *Id.* at 47, 64. Mother also testified that she underwent a mental health evaluation in January 2022 but denied having been diagnosed with any conditions. *Id.* at 46, 48. Mother further testified that she began attending a virtual parenting class in February 2021, but she has attended only nine classes thus far and has not yet completed the program. *Id.* at 49-50

In asserting that she made progress on the family service plan, Mother relies on her own testimony that she underwent a mental health evaluation in 2022 and has been attending therapy. Mother's Brief at 15-16; N.T., 6/2/22, at 46-47. However, as the orphans' court found, Mother failed to sign any releases for CYS to verify the evaluation or her participation in therapy. Orphans' Court Opinion, 10/11/22, at 9; N.T., 6/2/22, at 45. Mother testified that she could not provide CYS with a release because she was unable to send the release by mail. N.T., 6/2/22, at 45-46. Mother explained that the mailman refused to send out her mail because her name was not on the lease of her residence. *Id.* at 46, 54. When asked why she did not simply drop her mail in a mailbox, Mother testified, "Transportation." *Id.* at 55. Notably, despite claiming transportation posed an obstacle for her, Mother testified that she takes a bus twice a week to donate plasma. *Id.* at 66.

Ultimately, the orphans' court found that Mother was not credible. Orphans' Court Opinion, 10/11/22, at 6. The court was well within its discretion to find Mother's testimony not credible. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017) ("The [o]rphans' [c]ourt is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.") (citation omitted). By relying on her own self-serving testimony to bolster her claim, Mother essentially asks this Court to reweigh the evidence, and this we cannot do.

In addition, the orphans' court noted that Mother has not found a stable living arrangement. Orphans' Court Opinion, 10/11/22, at 9. The record reveals that, after her eviction in November 2020, Mother had stayed in various motels and hotels, was incarcerated for two months, and was living in a hotel in Virginia at the time of the subject proceeding. N.T., 6/2/22, at 9-10, 57, 60. On cross-examination, when asked if she has ever had a stable residence while in Virginia, Mother testified:

> Q. Alright, is it fair to say that you have not really had stable residence since you have been in Virginia, the [Commonwealth] of Virginia?
>
> A. I have been stable maybe once. That was my choice to leave due to the person I was staying with. So I never got kicked out of a spot since I've been in Virginia.

*Id.* at 57-58.

Further, Mother has failed to maintain consistent contact with Child. Family resource specialist, Ms. Johnston, testified that Mother attended only six in-person supervised visits between November 2020 and March 2021. *Id.* at 35. After Mother's release from prison in May of 2021, Mother was afforded supervised virtual visits with Child beginning on June 14, 2021. *Id.* at 22. Between June 14, 2021, and August 18, 2021, Mother attended only five out of eighteen virtual visits. *Id.* at 36-37. Mother was removed from the visitation schedule between August 18, 2021, and September 15, 2021, due to her failure to confirm four consecutive visits. *Id.* at 37. From September 15, 2021, to November 25, 2021, Mother participated in nine out of nineteen virtual visits. *Id.* Mother was removed from the schedule again on November 25, 2021, due to missing four consecutive visits. *Id.* Her virtual visits resumed on January 27, 2022, and since that time, she attended twenty out of approximately thirty-two virtual visits offered. *Id.* Ms. Johnston further testified that she ended one of Mother's virtual visits early because Mother was not paying attention to Child. *Id.* Rather, during that visit, Mother was yelling while reportedly babysitting her friend's children. *Id.* Ms. Johnston also testified that when Justice Works scheduled a special visit for Child's birthday in October 2021, Mother canceled at the last minute because she reported she was at a "church function." *Id.* at 38-39.

Notably, the testimonial evidence shows that even after her release from prison in May 2021, Mother has not returned to Pennsylvania to participate in

any in-person visits with Child. *Id.* at 11, 52-53. Specifically, Mother testified:

> Q. After you got bonded out, were you allowed to return to Pennsylvania?
>
> A. Yes. I was allowed after a couple of months with pre-trials and made sure that the charges were dropped and I didn't have to continue to go to [c]ourt. I am allowed to leave. . .
>
> . . .
>
> Q. Why did you not return to Pennsylvania after you were able to?
>
> A. Because I have everything down here. I have a job, I have a home. I think everything was doing great down her[e] now. So I decided I did not want to go back and it wasn't because I don't want to get my daughter, it wasn't because I don't want to see her. I've always wanted to get her back and I always want to see her. It's just, Pennsylvania was too much for me and I have no family there but her and I didn't want to be there by myself so I just stayed in Virginia. But, I will always care about getting my daughter back and seeing her. I just didn't want to go back to Pennsylvania because there was nothing there for me.

*Id.* at 52-53. Mother later clarified that she "just started" her employment at 7-11 the "Tuesday after Memorial Day." *Id.* at 67.

Accordingly, the record reveals that Mother's repeated and continued incapacity, neglect or refusal has caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being, and the conditions and causes of the incapacity, neglect or refusal cannot or will not be remedied by the parent. During the eighteen months that Child was in CYS custody, Mother saw then one-year-old Child in-person only six

times, and she sporadically attended virtual visits. Mother failed to obtain stable or suitable housing. Despite Mother's self-serving testimony that she underwent a mental health evaluation that rendered no diagnoses and that she is attending therapy sessions, Mother failed to provide CYS with a release to verify her claims, and the orphans' court found Mother not fully credible. The testimony further reveals that, despite claiming that she wants her daughter back, Mother has not returned to Pennsylvania to see Child in-person after her release from prison in May 2021. Thus, we find no error or abuse of discretion by the trial court in terminating Mother's parental rights under Section 2511(a)(2).

Proceeding to Section 2511(b), Mother has waived any claim that the orphans' court erred by concluding that termination of her parental rights would best serve Child's needs and welfare because she fails to develop this claim. *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority"). Mother cites no relevant authority and does not provide any argument challenging the termination of her parental rights pursuant to Section 2511(b).

Even if this claim were not waived, we conclude that the record provides competent evidence in support of the court's decision to terminate Mother's parental rights under Section 2511(b). With respect to Section 2511(b), this

Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained, "[c]ommon sense dictates that courts considering termination must also consider whether the [child is] in a pre-adoptive home and whether [the child has] a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

The record here shows no evidence of a meaningful bond between Mother and Child. The family resource specialist, Ms. Johnston, testified that during the virtual visits, Mother communicates more with Ms. Johnston or the caregiver than with Child. N.T., 6/2/22, at 39. Ms. Johnston testified that even though Mother tries to get Child's attention by calling her name, Child

does not go to Mother on the phone. *Id.* at 39. When asked how Child refers to Mother during the virtual visits, Ms. Johnston testified:

Q. How does [Child] refer to the [M]other during these zoom visits?

A. In my opinion, [Child] does not look at the phone, does not call her mother, does not interact with her. She interacts with the caregiver more, and call[s] her mom during the visits.

*Id.* at 40. While visits are scheduled for an hour, Ms. Johnston testified that the visits "rarely" last the full hour. *Id.* She testified Mother would be "staring at [Child] playing or talking to us, . . . the caregiver or myself." *Id.* Ms. Johnston testified that she tries to reengage Child into the visit, but "sometimes, it just doesn't work out that way" and Mother will end the visit early. *Id.* at 40-41. On cross-examination, Ms. Johnson testified that Mother has not shown improvement with interacting with Child during the visits. *Id.* at 42.

Moreover, the evidence demonstrates that Child is bonded with her foster parents. Ms. Roberts testified that Child is doing "very well" with foster parents, appears to be "very bonded" with the foster parents, and "appears to be thriving." *Id.* at 25. Ms. Roberts noted that Child does not have any development or emotional issues and that Child is physically "doing fine." *Id.* at 25-26. She testified that foster parents are willing to "offer permanency" for Child. *Id.* at 26. Similarly, Ms. Johnston testified that during Mother's

virtual visits, Child interacted more with the caregiver and called the caregiver "mom." **_Id._** at 40.

Accordingly, we conclude that the orphans' court did not err or abuse its discretion in terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/27/2023